UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 19-123-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| DAMON BRISTOL HARDY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Damon Hardy is charged with possession with intent to distribute heroin, a mixture or substance containing a detectable amount of fentanyl, a mixture or substance containing a detectable amount of tramadol, and a quantity of pills containing a detectable amount of alprazolam. [Record No. 1] He moved to suppress all evidence seized on April 2, 2019, at his Versailles home. [Record No. 15] The motion was referred to United States Magistrate Judge Matthew A. Stinnett for issuance of a Report & Recommendation ("R&R") in accordance with 28 U.S.C. § 636(b)(1)(B) and Fed. R. Crim. P. 59. Magistrate Judge Stinnett has recommended that the Court deny Hardy's motion to suppress. [Record No. 22]

Although this Court must make a *de novo* determination of those portions of the Magistrate Judge's recommendations to which objections are made, 28 U.S.C. § 636(b)(1)(C), "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Nevertheless, the Court has carefully examined the entire record. Having made a *de novo* determination on all issues,

-1-

including those raised in the defendant's objections to the R&R [Record No. 28], the Court agrees with the Magistrate Judge's recommendation to deny the motion.

I.

An anonymous source of information ("SOI") contacted Versailles Police Department Assistant Chief Rob Young ("Young") on April 2, 2019, notifying him that Hardy was at his Versailles home and in possession of either heroin, carfentanil, or fentanyl. [Record No. 21, p. 11] The SOI also indicated that Hardy and his mother were attempting to move the drugs from the residence. *Id.* Young identified the SOI by the sound of his voice over the telephone and testified that this informant had previously provided the Versailles Police Department with credible information that led to arrests and recoveries of evidence. *Id.* at pp. 13-14. Additionally, a different confidential informant had indicated to Young that Hardy was trafficking heroin. *Id.* at p. 14. Young asked Detective Matt Mitchell ("Mitchell") to conduct a "welfare check" at Hardy's residence. *Id.* at p. 17.

Mitchell, Sergeant Tim Conner ("Conner"), and Officer Jordan Lyons ("Lyons") arrived at Hardy's residence about an hour after Young received the SOI tip. *Id.* at p. 27. They drove three separate vehicles, two of which were marked, and passed through an open gate onto Hardy's private gravel road. *Id.* at pp. 33-34, 43. Witnesses for the defense testified that the gate is ordinarily padlocked, but they agreed that the gate was unlocked and open that day. *Id.* at pp. 72-73, 78. None of the officers testified to seeing a "Private Property. No Trespassing." sign when they entered the driveway from the public Pisgah Pike, *id.* at pp. 35, 43, 53, but Mitchell stated that he has since seen a sign that reads "Private Property." while passing the entrance. [Record No. 21, p. 42-43] Although the defense disputes this testimony, [*id.* at p. 75; Record No. 16], the Versailles policemen stated that they clearly could see the

house from the entrance to the property because there were no leaves on the trees at that time of the year. [Record No. 21, pp. 35, 45, 68-69] Mitchell further testified that there was no indication that Hardy had attempted to obscure the view of the residence from the public road. *Id.* at p. 36.

The officers approached the house, driving the approximately two-to-three hundred yards between the open entrance gate and the residence. *Id.* at pp. 36, 46, 56, 65. As they approached, the officers observed two individuals (Hardy and his mother) on the front porch and witnessed Hardy go inside the house. *Id.* at p. 57. They drove around the circular driveway at the end of the road and saw the defendant running out the backdoor and across the yard. *Id.* at pp. 36-37, 67.

Lyons immediately gave chase in his vehicle, cutting through the yard to apprehend Hardy. *Id.* at pp. 57-58. He observed Hardy throw a shiny silver object during the pursuit, and he exited the vehicle to detain the defendant. *Id.* at pp. 57-59. After the other officers arrived in the backyard and Hardy was detained, Lyons picked up the discarded object laying twenty-to-thirty feet away on the ground. *Id.* at pp. 40, 57-59, 70. The defendant warned the officers that the object contained carfentanil before they opened the shiny container. *Id.* at pp. 40, 45, 60, 70. When opened, the contents included alprazolam pills as well as a bag of powder that tested positive for fentanyl, heroin, and tramadol. [Record No. 18, p. 2] The officers contemporaneously arrested Hardy. *Id.*

## II.

Hardy claims that the officers' entrance onto his property, approach of the house, and pursuit through the yard violated his Fourth Amendment rights. [Record No. 16, 18] But as Magistrate Judge Stinnett properly concluded, these claims lack merit. [Record No. 22] The

Versailles Police Department entered the property to conduct a valid "knock and talk" welfare check, and they lawfully chased the fleeing defendant to the approximate spot where they obtained the drug container and made the arrest.

Police officers, like private citizens, have an implied license to approach a home, knock on the door, ask questions of present residents, and attempt to obtain permission to enter without first obtaining a warrant. *Florida v. Jardines*, 569 U.S. 1, 8 (2013). The fact that such an approach requires an officer to go through a home's constitutionally protected curtilage does not make the approach unlawful if custom dictates that a private citizen could similarly enter the curtilage to solicit those inside the home. *Id.* The Sixth Circuit has recognized "knock and talk" police activity, determining that the conduct is lawful if no "overbearing tactics [] essentially force the individual out of the home." *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005). Further, a "No Trespassing" sign does not change this analysis where the residence is visible from the sign location, the area alleged to be curtilage is not an enclosure immediately surrounding the residence, the area alleged to be curtilage has no special uses, and the resident has taken no steps to prevent passersby from observing the area. *United States v. Hopper*, 58 F. App'x 619, 623 (6th Cir. 2003) (applying the factors outlined in *United States v. Dunn*, 480 U.S. 294, 300 (1987) to determine that an area marked by two "No Trespassing" signs did not receive Fourth Amendment protection).

The officers' entrance onto the property and approach of the residence on the gravel road did not violate Hardy's Fourth Amendment rights. Mitchell, Conner, and Lyons were acting on the SOI information that Hardy had possession of extremely harmful substances, and, upon Young's request, visited the property to inquire into the welfare of the defendant (and potentially his mother). Any private citizen could have similarly entered the property

-4-

through the open gate, driven up the gravel road, and knocked on the door. The defendant objects to the R&R, arguing that the public was not allowed onto the property, the gate was usually locked, and visitors ordinarily had to call Hardy before paying him a visit. [Record No. 28] These assertions may be true, but they do not change the fact that the gate was unlocked and open on April 2, 2019. Any citizen could have solicited the defendant at his residence on the day in question without legal recourse. Further, Hardy himself previously argued in his memorandum supporting the motion to suppress [Record No. 16] that, "a majority of the time," visitors called him before coming onto his property. This suggests that some visitors or solicitors had previously arrived at Hardy's door unannounced, an unremarkable and legal occurrence. *See Jardines*, 569 U.S. at 8.

The officers maintain that they did not see the sign posted at the entrance to the property, but even if they had not testified to this point, the sign has no talismanic power to wrap the entire property in impenetrable Fourth Amendment protections. The police claimed that they could see the house from the entrance. The distance between the open gate and the house is two-to-three hundred yards, and the gravel road ingress is not an enclosure in the immediate vicinity of the residence. The private road is merely a means to access the residence. Finally, there were no efforts to conceal the house or the gravel road from passersby. Therefore, the area marked by the sign, the gravel road, was not part of the house's curtilage. The sign did not destroy the implied license to follow the gravel road over several hundred yards, knock on the house's front door, and inquire into the wellbeing of the resident.

Of course, the Versailles police did not have the opportunity to "talk" to Hardy, let alone "knock" on his front door. The defendant contends that the ensuing chase crossed over his constitutionally-protected yard to arrive at the location of the drugs, approximately twenty-

to-thirty feet away from where he was apprehended. [Record No. 16, 28] Whether the open yard is actually curtilage-protected under the Fourth Amendment is debatable, but Lyons' pursuit and arrival at the location of the drugs was clearly lawful even if it that portion of the yard is part of the curtilage.

The Fourth Amendment requires that, "absent exigent circumstances," the police must have a search warrant to intrude upon the curtilage of a home to look for drug operations. *Dunn*, 480 U.S. at 310-11. An exigent circumstance justifies warrantless entrance into a constitutionally-protected area when an officer has not "create[d] the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 462 (2011). "Hot pursuit of a fleeing suspect" is one of the more common exigency exceptions to the warrant requirement. *Id.* at 460.

Hardy's flight and Lyons' subsequent chase across the yard neatly fits the well-established hot pursuit exception. After the officers saw Hardy on his front porch while they were driving toward the house, they witnessed him fleeing out the backdoor and across his yard. Hardy argues that the officers could not have seen him flee across the backyard from their cars in the driveway [Record No. 16], but they credibly testified to the contrary. This flight -- accompanied by the fact that they were responding to SOI information on Hardy's drug possession -- made Hardy a fleeing drug offense suspect. The officers did nothing to create the exigency, as Hardy fled before they even had the opportunity to get out of their cars and approach the home. Lyons' pursuit was accordingly lawful, as he drove though the yard and around the house to intercept Hardy in the area where the defendant had discarded the evidence.

The Versailles officers had an implied license to enter the property and drive up the private gravel road to attempt to talk to Hardy at his residence, notwithstanding the presence of a "Private Property. No Trespassing." sign. And even if Lyons did cross through the curtilage of the house to apprehend Hardy, the defendant was a suspect fleeing the scene. The chase was, at the very least, justified as a hot pursuit exigency. Therefore, the officers did not infringe on the defendant's Fourth Amendment rights in their arrival on the scene and pursuit of Hardy to the location of the discarded drug container.

### III.

Hardy also argues that the SOI tip was not credible enough to provide probable cause or reasonable suspicion to enter the property to conduct a warrantless search. [Record No. 16] As suggested by the analysis above, however, the SOI information need not have given the officers probable cause to enter the property to conduct a "knock and talk." They had an implied license to enter the property to attempt to speak with Hardy without giving him prior notice, as the defendant indicated other private individuals had done in the past. [Record No. 16] Young's testimony bolstered the tip's credibility, but the officers could have justifiably driven through the open gate and up the road to Hardy's house regardless of whether the information was credible enough to meet the probable cause or reasonable suspicion standards.

The defendant further contends that the SOI tip was not credible enough to permit a warrantless arrest. [Record No. 16] This argument is less relevant to the suppression proceeding because the drug evidence the defendant seeks to exclude was not seized as a result of the arrest.[1] Hardy discarded the shiny drug container during his flight from the police. As

---

[1] A charitable reading of the motion's seeks to "suppress all the evidence seized" [Record No. 15] might suggest that the defendant desires to suppress Hardy's warning that the container

the Magistrate Judge points out, however [Record No.22, p. 9], the Sixth Circuit has found that a defendant who discards a piece of evidence while fleeing the police "disclaim[s] and renounce[s] any ownership interest in [it]." *United States v. Green*, 157 F. App'x 853, 857 (6th Cir. 2005). The defendant has lost any reasonable expectation of privacy in the abandoned evidence, and officers who find it can accordingly seize and search it without violating a defendant's Fourth Amendment rights. *Id.* The legality of Hardy's arrest has little bearing on the legality of the container's seizure because Hardy abandoned the object before the officers detained him. The officers lawfully pursued the fleeing Hardy to the approximate area where he had discarded the container (a piece of ground twenty-to-thirty feet away in the backyard) and appropriately took possession of the abandoned drug container.

The Magistrate Judge provided a thorough analysis of the SOI tip's credibility and its interplay with Hardy's lawful arrest [Record No. 22, pp. 5-9], but suppression of the seized drugs does not ultimately hinge on whether the SOI provided the Versailles officers with probable cause or reasonable suspicion to visit Hardy or make the arrest. The officers could conduct a welfare check with a "knock and talk" procedure without meeting either standard, and they were entitled to seize the shiny drug container by virtue of its abandonment during the chase.

---

contained carfentanil. The defendant's detention and arrest would have more impact on his ability to successfully suppress the warning than his ability to suppress the drugs found in the container. Nevertheless, this argument was not substantively briefed in the defendant's memorandum in support of the motion to suppress [Record No. 16], addressed at the suppression hearing [*see* Record No. 21], or raised as an objection to the R&R. [Record No. 28] The R&R [Record No. 22] does not discuss whether Hardy can suppress the warning, a further indication that the defendant has not adequately raised the issue. Hardy has not raised suppression of the warning as a ground for the motion and has likewise failed to offer a "legal argument necessary to support it." [LCrR 12.1(a)] Therefore, the Court will not suppress the warning.

**IV.**

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1. The Magistrate Judge's Report and Recommendation [Record No. 22] is **ADOPTED** in full and **INCORPORATED** here by reference.

2. The defendant's motion to suppress all evidence seized on April 2, 2019 [Record No. 15] is **DENIED**.

Dated: August 23, 2019.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky